1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HARSH ALKUTKAR,

                    Plaintiff,

        v.

BUMBLE INC., et al.,

                    Defendants.

Case No.  22-cv-00422-PJH

**ORDER GRANTING DEFENDANTS'
MOTION TO COMPEL ARBITRATION**

Re: Dkt. No. 30

Defendants' motion to compel arbitration came on for hearing before this court on August 4, 2022.  Plaintiff appeared through his counsel, Daniel A. Rozenblatt and Cody R. Padgett.  Defendants appeared through their counsel, Kyle C. Wong, Sharon Song, and Gia Jung.  Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

## BACKGROUND

Plaintiff Harsh Alkutkar is a resident of Daly City, California, and a user of the online dating app Bumble.  Compl. ¶ 10.  Defendant Bumble Inc. is a Delaware corporation, with its principal place of business in Austin, Texas.  Compl. ¶ 11. Defendant Bumble Holding Limited is a corporation organized and operated in the United Kingdom.  Compl. ¶ 12.  Bumble Holding Limited is a subsidiary of Bumble Inc. and is listed as the recipient of payments made on the Bumble app.  The court refers to defendants collectively as "Bumble" throughout.

**A.     Bumble App**

Bumble operates a popular online dating, friendship, and professional networking application (the "Bumble app"), on which users can create a profile with photos and information about themselves.  Compl. ¶ 1.  The Bumble app launched in 2014 and has over 1 million paying users.  Compl. ¶ 17.  Users of the Bumble app can create a profile and use the app to swipe through and potentially match with other Bumble app users for free.  Compl. ¶ 18.  A user is presented with other user profiles that can be swiped left to "dislike" or right to "like" the other user's profile.  Compl. ¶ 1.  If two users mutually right-swipe each other's profiles, a match is created.  Compl. ¶ 2 n.1.  When a match is made between a man and a woman, a private line of communication is created between the two in the Bumble app, and the woman can initiate a conversation.  Compl. ¶ 2 n.1.

**B.     Bumble App's SuperSwipes and Spotlights**

The Bumble app offers for sale certain premium features that "increase the likelihood of matching with another user."  Compl. ¶¶ 2,18.  Two of those features are called SuperSwipes and Spotlights.

SuperSwipes allow a user to let potential matches know that he or she is particularly interested in them.  Compl. ¶ 19.  Specifically, a user can use a SuperSwipe to tap a yellow heart at the top right of other users' profiles, which would inform the other users that they've been "SuperSwiped" by the user before they swipe left or right on the user's profile.  Compl. ¶¶ 4 n.2, 19.  As provided by the screenshots included in the complaint, Bumble app users can purchase SuperSwipes in packs of various quantities, including 30, 15, five, and one.  Compl. ¶¶ 3, 20.

With Spotlights, a user can activate the Spotlight mode, which advances a user's profile to the top of the list of potential matches so that it can be more viewable by other users in a geographic area. Compl. ¶¶ 8 n.7, 21.  A user can use one Spotlight to activate the mode for 30 minutes or two Spotlights to activate the mode for 150 minutes.  Compl. ¶ 8 n.7.  Bumble app users can purchase Spotlights in packs of various quantities, including 30, 15, five, and one.  Compl. ¶¶ 3, 22.

### C.      Plaintiff's Allegations

Plaintiff alleges that Bumble advertises Spotlights as providing "Up to 10x more matches" and SuperSwipes as providing "Up to 10x more conversations," and that such advertising is a "gross exaggeration[] of the actual benefits these features provide." Compl. ¶¶ 3-4.  The "up to 10x more" statements appear in the screenshots below:

 

Compl. ¶ 3.

Plaintiff alleges that on March 21, 2021, he purchased a pack of 15 SuperSwipes from within the Bumble app.  Compl. ¶¶ 10, 33.  Plaintiff claims that "[b]ased on" Bumble's statement that SuperSwipes would provide "Up to 10x more conversations," he believed he would receive "ten times, or close to ten times, more matches and conversations than he usually received without the use of SuperSwipes."  Compl. ¶ 33. Plaintiff further alleges that there was no discernable increase in his number of matches or conversations as a result of using the SuperSwipes he purchased, and even if there was, it would be "negligible and/or nowhere close to the 10x multiplier promised."  Compl. ¶ 33.

Plaintiff also claims that he subsequently purchased packs of five and 15 Spotlights, respectively, on August 15, 2021, and September 9, 2021, on the Bumble app.  Compl. ¶¶ 10, 34.  Plaintiff alleges that based on Bumble's statements that

Spotlight would provide "Up to 10x more matches," he believed he would receive "ten times, or close to ten times, more matches than he usually receives without the use of Spotlights."  Compl. ¶ 34.  Plaintiff further contends that there was no discernable increase in his number of matches as a result of using the Spotlights he purchased. Compl. ¶ 34.  Plaintiff alleges that even if there was an increase in his number of matches, it "was negligible and/or nowhere close to the 10x multiplier promised."  Compl. ¶ 34.

**D.      Bumble's Terms and Arbitration Agreement**

According to defendants' records, plaintiff created a Bumble account on February 16, 2016, and has maintained an account ever since.  See Chheena Decl. ¶ 6 (Dkt. 30-1 at 2-3).  On or around January 19, 2021, Bumble emailed all users who had signed up for a Bumble account before that date to inform them that Bumble's Terms were being updated to include, among other things, the Arbitration Agreement, effective as of January 18, 2021 (the "Notice Email").  Chheena Decl. ¶ 8 (Dkt. 30-1 at 3).  Bumble's records show that plaintiff received the Notice Email from Bumble on January 19, 2021, with the subject line "UPDATED TERMS AND CONDITIONS OF USE."  Chheena Decl. ¶ 9 (Dkt. 30-1 at 3).  The Notice Email advised users of the following in the first paragraph:

> We (Bumble Group) are updating our Terms and Conditions. . . . Effective as of January 18, 2021, updates have gone into effect for our Terms and Conditions of Use. Continued use of Bumble will constitute acceptance of the updated Terms and Conditions of Use. For your convenience, we've put together the following summary of some of the important changes, though we recommend reviewing the Terms and Conditions in full.  You can find the full Terms and Conditions here: https://bumble.com/en/terms.

Chheena Decl., Ex. A (Dkt. 30-2).  The blue-font URL in the Notice Email was a direct hyperlink to the full version of the Terms containing the Arbitration Agreement.  See Chheena Decl., Ex. B (Dkt. 30-3).  The Notice Email further informed users that the updated Terms provide "that any covered dispute . . . between you and Bumble Group that cannot be resolved informally or in small claims court will be settled by binding

4

United States District Court
Northern District of California

arbitration rather than through court proceedings," but that "users who signed up before January 18, 2021 will have the option to opt out of the arbitration agreement by 30 days from January 19, 2021."  Chheena Decl., Ex. A (Dkt. 30-2).

Beyond the Notice Email, for all users that signed up for a Bumble account before January 18, 2021, an in-app "Blocker Card" entitled "Updated terms and conditions of use" popped up when those users opened the Bumble app for the first time after January 18, 2021.  Chheena Decl. ¶ 11 (Dkt. 30-1 at 3-4).  The Blocker Card stated that Bumble's updated Terms "contain an Arbitration Agreement that includes a class action waiver, under which both you and Bumble agree to resolve disputes through final and binding arbitration on an individual basis."  Chheena Decl. ¶ 11 (Dkt. 30-1 at 3-4).  The Blocker Card advised users that "[t]o use Bumble . . ., you must agree to the updated Terms" and prevented Bumble users from accessing or using the Bumble app unless they clicked on an orange colored "I agree" button.  Chheena Decl. ¶¶ 11-13 (Dkt. 30-1 at 3-4).  The Blocker Card that was shown on the Bumble app looked like this image:



Chheena Decl. ¶ 11 (Dkt. 30-1 at 4).  At all relevant times, the bold and underlined text "Terms and conditions" in the blocker card was a direct hyperlink to an online copy of the referenced Terms.  Chheena Decl. ¶ 13 (Dkt. 30-1 at 4).  The parties resolved through briefing that the Blocker Card's orange bubble included the word "I accept" instead of the "I agree" shown above.  Wong Decl. ¶ 14 (Dkt. 36-1 at 5).

Bumble's records reflect that plaintiff accessed the app for the first time after the Blocker Card was implemented on March 4, 2021, and they infer based on this access that he clicked his assent to the updated Terms.  Chheena Decl. ¶ 14 (Dkt. 30-1 at 3-4).  Bumble's records indicate that plaintiff did not send an email to bumbleoptout@team.bumble.com to opt out of the Arbitration Agreement.  See id. ¶ 15.  The preamble to the Terms, in the third paragraph, notifies Bumble users in bold font that "Section 13 of these Terms . . . **contains an arbitration agreement that will, with limited exceptions, require disputes between [Bumble and its users] to be submitted to binding and final arbitration**. If you are an existing user or a new user who signed up for Bumble before January 18, 2021, you have a right to opt out of the arbitration agreement pursuant to Section 13 below."  Chheena Decl., Ex. B (Dkt. 30-3 at 2) (emphasis in original).

**E.    Procedural History**

Plaintiff brings the following five causes of action, all of which are based on Bumble's alleged false advertising for SuperSwipes and Spotlights:

(1) negligent misrepresentation,

(2) intentional misrepresentation,

(3) violation of California's Consumers Legal Remedies Act,

(4) violation of California's False Advertising Law, and

(5) violation of California's Unfair Competition Law under the unlawful, fraudulent, and unfair prongs.

Plaintiff seeks class certification; injunctive relief; actual and punitive damages; attorneys' fees and costs; and pre- and post-judgment interest.  See Compl. at 20.

United States District Court
Northern District of California

Plaintiff proposes the following class definition:

> All persons who, on or after January 22, 2017, purchased a Pack of SuperSwipes or a Pack of Spotlights from within the Bumble app that were advertised to provide "Up to 10x more conversations" or "Up to 10x more matches."

Compl. ¶ 35.

Defendants responded to the complaint with a motion to dismiss. Dkt. 28. One day later, they filed the instant motion to compel arbitration. Dkt. 30. Defendants request that the court consider the motion to compel arbitration first, without reaching the arguments presented in support of dismissal.

## DEFENDANTS' ADMINISTRATIVE MOTION

There is a general presumption in favor of public access to federal court records. "[T]he proponent of sealing bears the burden with respect to sealing. A failure to meet that burden means that the default posture of public access prevails." Kamakana v. City & County of Honolulu, 447 F.3d 1172, 1182 (9th Cir. 2006). A party seeking to seal materials submitted with a motion that is "more than tangentially related to the merits of the case"—regardless whether that motion is "technically dispositive"—must demonstrate that there are compelling reasons to keep the documents under seal. Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092, 1101-02 (9th Cir. 2016).

Defendants filed an administrative motion to file under seal exhibits 1 and 2 to the Wong declaration. See Dkt. 36-1. Exhibit 1 to the Wong declaration is an action log that details the development process of adding the Blocker Card to the user interface of the Bumble app. Sharon Song Decl. ¶ 4 (Dkt. 35-1 at 2). The action log includes confidential and competitively sensitive information about the app's operation and development. Exhibit 2 to the Wong declaration includes confidential personal information relating to plaintiff, including a metadata excerpt that includes the "internal encrypted user identification number associated with Plaintiff's unique login credentials for the Bumble app and personal details about Plaintiff, e.g., age, country of residence, gender, etc." Dkt. 35 at 4. Defendants remark that it is not their burden to establish that plaintiff's

personal information should be sealed, but they also ask to seal the exhibit to protect Bumble's confidential and competitively sensitive information, including internal codes associated with app features and operations.  In support of sealing, defendants cite to Space Data Corp. v. X, No. 16-CV-03260-BLF, 2017 WL 11503233 (N.D. Cal. Sept. 25, 2017), where the court allowed sealing of "technical proprietary confidential information and business planning and financial information, including trade secrets, which disclosure could economically harm [the moving party's] business."  Id. at *2.

Plaintiff makes no comment regarding defendants' motion.  Plaintiff does not oppose the motion to seal.  Plaintiff also does not seek to seal his personal information, but because it is all in Bumble's code, it is unclear what portions of the exhibits constitute his information.

The court finds the Wong declaration exhibits more than tangentially relevant to the merits of the case where they weigh on plaintiff's demonstrated assent to arbitration, as discussed further below.  And the court accepts that the proprietary technical information included within the exhibits, if disclosed, could economically harm defendants' business.  Therefore, the court GRANTS the unopposed administrative motion to file the two exhibits under seal.

**DISCUSSION**

**A.    Legal Standard**

Any party bound to an arbitration agreement that falls within the scope of the Federal Arbitration Act ("FAA"), Title 9 U.S.C. §§ 1, et. seq., may bring a motion to compel arbitration and stay the proceeding pending resolution of the arbitration.  9 U.S.C. §§ 3-4; Lifescan, Inc. v. Premier Diabetic Servs., Inc., 363 F.3d 1010, 1012 (9th Cir. 2004).  The FAA requires the court to compel arbitration of issues covered by the arbitration agreement.  Dean Witter Reynolds, Inc., v. Byrd, 470 U.S. 213, 218 (1985).

The Ninth Circuit recently restated the analytical steps trial courts must follow in assessing motions to compel arbitration: (1) they must first "resolve any challenge that an agreement to arbitrate was never formed," and (2) they must then "resolve any challenge

1   directed specifically to the enforceability of the delegation clause." Caremark, LLC v.

2   Chickasaw Nation, 43 F.4th 1021, 1029 (9th Cir. 2022).  If there exists a valid delegation

3   clause, the court must compel all arguments regarding the scope or enforceability of the

4   arbitration provision to the arbitrator.  Id. at 1030.  This assessment limits the scope of

5   review—the court does not address challenges to the validity of the contract as a whole,

6   leaving such disputes for the arbitrator to resolve in the first instance.  Id. at 1029-30.

7          Regarding whether an agreement exists to arbitrate, the first step, the "first

8   principle" that underscores the U.S. Supreme Court's arbitration decisions is that

9   "[a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes—

10  but only those disputes—that the parties have agreed to submit to arbitration." Granite

11  Rock Co. v. Int'l B'hd of Teamsters, 561 U.S. 287, 299 (2010); First Options of Chicago,

12  Inc. v. Kaplan, 514 U.S. 938, 943 (1995).  Thus, "a court may order arbitration of a

13  particular dispute only where the court is satisfied that the parties agreed to arbitrate *that*

14  *dispute*." Granite Rock, 561 U.S. at 297 (emphasis in original).

15         Regarding the enforceability of a delegation clause, the second step, the FAA

16  provides that arbitration clauses "shall be valid, irrevocable, and enforceable, save upon

17  such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

18  Thus, state contract defenses may be applied to invalidate arbitration or delegation

19  clauses if those defenses apply to contracts generally.  Doctor's Assocs., Inc. v.

20  Casarotto, 517 U.S. 681, 687 (1996); Circuit City Stores, Inc. v. Adams, 279 F.3d 889,

21  892 (9th Cir. 2002).  A delegation clause is "essentially a mini-arbitration agreement,

22  nested within a larger one." Caremark, 43 F.4th at 1029.

23         Regarding the scope of the agreement, "any doubts concerning the scope of

24  arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp.

25  v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).  Nevertheless, a motion to compel

26  arbitration should be denied if "it may be said with positive assurance that the arbitration

27  clause is not susceptible of an interpretation that covers the asserted dispute." AT&T

28  Techs., Inc. v. Commc'n Workers, 475 U.S. 643, 650 (1986).

United States District Court
Northern District of California

**B.     Analysis**

The overarching dispute in this motion is whether plaintiff agreed to arbitrate.  "In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'"  Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175 (9th Cir. 2014) (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).  Though Bumble highlights that the Terms include a Texas choice of law provision, it acknowledges that there is no conflict between Texas and California law for purposes of assent and enforceability of an arbitration agreement.  Dkt. 36 at 7 n.2.  The parties do not argue that a choice of law analysis is necessary at this stage, and both rely on California authority.  Id.; see also Dkt. 32 at 11-12.  The questions of contract formation and enforceability are thus assessed under California law.  After first assessing whether an agreement to arbitrate was formed, the court addresses whether there existed an enforceable delegation provision in the Arbitration Agreement.

**1.     Formation of Agreement to Arbitrate**

The facts here require a two-step assessment to determine whether a valid agreement was formed: first, whether either of Bumble's two online presentations of the updated Terms to plaintiff was effective to form an agreement, and second, whether acceptance of the updated Terms can be authenticated as an act of plaintiff.

**a.     Enforceability of Internet-Based Agreements**

"Contracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen."  Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175-76 (9th Cir. 2014).  Importantly, "[u]nlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly . . . [a] party instead gives his assent simply by using the website." Id. (internal quotation marks omitted).  "Indeed, 'in a pure-form browsewrap agreement,

the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service.'" Id. (quoting Fteja v. Facebook, Inc., 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012)).  The "validity of [a] browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions."  Id.  Thus, whether there is a valid agreement "turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract," which in turn "depends on the design and content of the website."  Nguyen, 763 F.3d at 1177.

Bumble argues that plaintiff assented to its updated Terms, including the Arbitration Agreement, (1) when he allegedly received the Notice Email on January 19, 2021, and thereafter continued to use the app, and (2) when he allegedly viewed the Blocker Card and clicked "I agree" on March 4, 2021.  See Dkt. 30 at 8, 10; Chheena Decl. ¶¶ 9, 14 (Dkt. 30-1 at 3-4).  The Notice Email and the Blocker Card constitute different types of potential agreements to the updated Terms.

The Notice Email falls closer to the browsewrap type of agreement where it advises that "[c]ontinued use of Bumble will constitute acceptance of the updated Terms[.]"  Chheena Decl. ¶ 9 (Dkt. 30-1 at 3); Wong Decl. ¶¶ 24-25 (Dkt. 36-1 at 8).  Defendants' email record does not establish that plaintiff had actual or constructive knowledge of the updated Terms because Bumble does not maintain records of the actual emails sent to users, and it has no record that the email was received or even opened.  See Wong Decl. ¶ 26 (Dkt. 36-1 at 8-9).  The Notice Email is thus insufficient to show plaintiff's assent to the new Terms and the included Arbitration Agreement.

In contrast to the browsewrap agreement suggested by the Notice Email discussion above, the Blocker Card falls closer to the clickwrap form of Internet-based contract formation.  See Nevarez v. Forty Niners Football Company, Inc., 2017 WL 3492110, at *7 (N.D. Cal. Aug. 15, 2017) (explaining a middle-ground between these approaches).  The Blocker Card is not, however, a "pure-form clickwrap agreement" in which "users typically click an 'I agree' box after being presented with a list of terms and

United States District Court
Northern District of California

1   conditions of use." Fteja, 841 F. Supp. 2d at 836-37.  A Bumble user was not forced to

2   read the updated Terms before assenting to them, but the user was forced (and still is

3   forced) to click "I accept" demonstrating their assent to the updated Terms, which were

4   hyperlinked.  Wong Decl. ¶ 14 (Dkt. 36-1 at 5).  And the Blocker Card was robust in its

5   description of the exact portion of the updated Terms now at issue, the "Arbitration

6   Agreement that includes a class action waiver, under which both you and Bumble agree

7   to resolve disputes through final and binding arbitration on an individual basis, and not by

8   way of traditional litigation in state or federal court."  See Wong Decl. ¶ 13 (Dkt. 36-1 at

9   5).  Though not a "pure-form clickwrap agreement," the Blocker Card represents a type of

10  clickwrap agreement that should be enforced if accepted by plaintiff because clicking "I

11  accept" to proceed past the Blocker Card required affirmative action demonstrating

12  assent.  The essence of the remaining dispute is whether plaintiff electronically signed

13  the updated Terms including the Arbitration Agreement—that is, whether plaintiff saw the

14  Blocker Card and clicked his assent.

15              **b.       Plaintiff's Assent to the Internet-Based Agreement**

16              An electronic signature can be authenticated "*in any manner*, including a showing

17  of the efficacy of any security procedure applied to determine the person to which the

18  electronic record or electronic signature was attributable."  Ruiz v. Moss Bros. Auto Grp.,

19  232 Cal. App. 4th 836, 843 (2014) (quoting Cal. Civ. Code § 1633.9(a)) (emphasis in

20  original).  The Court of Appeal made clear that "the burden of authenticating an electronic

21  signature is not great."  Id. at 844 (citing Cal. Civ. Code § 1633.9(a)).  The court noted

22  this standard for authentication as it considered the sufficiency of evidence to

23  demonstrate whether an employee electronically signed an arbitration agreement.  Ruiz,

24  232 Cal. App. 4th at 838.  Ruiz, the employee, declared that he did not recall signing an

25  arbitration agreement.  Id. at 840.  Though the defendant's business manager certified

26  that every employee was required to log into the an electronic human resources system

27  and assent to the agreement, she was unable to explain how she was sure that the

28  electronic signature was "the act of" Ruiz, she failed to address whether some other

United States District Court
Northern District of California

1    employee could have written Ruiz's name, and she failed to explain whether the date and

2    time next to the purported electronic signature automatically recorded the actual date and

3    time of signing.  Id. at 843-44 (quoting Cal. Civ. Code § 1633.9(a)).  The appellate court

4    affirmed the trial court's determination that Moss Bros. did not provide enough evidence

5    to authenticate Ruiz's electronic signature on the arbitration agreement.  Id. at 838.

6           In another case considering the authentication of an online assent to arbitration,

7    Ngo v. PMGI Fin., LLC, No. 18-cv-05401-JCS, 2018 WL 6618316 (N.D. Cal. Dec. 18,

8    2018), the plaintiff similarly declared that he did not recall signing an arbitration

9    agreement.  Plaintiff argued that the defendant's failure to describe the security measures

10   taken to ensure that no one else could assent to the agreement left open the possibility

11   that someone else clicked to accept the arbitration agreement.  Id. at *5.  The court,

12   noting the mere preponderance standard and citing to Ruiz, determined that a

13   combination of factors, including unique credentials, a demonstrable consequence, and

14   an indicative timeline, supported the authentication of the plaintiff's electronic signature

15   even though he declared he did not recall agreeing to arbitration.  Id. at *6.

16          Here, defendants offer declarations and documents that they say provide an

17   electronic record of plaintiff's click of the Blocker Card.  See Chheena Decl. ¶¶ 11-14

18   (Dkt. 30-1 at 3-4); Wong Decl. ¶¶ 11-20 (Dkt. 36-1 at 4-8).  Bumble avers that plaintiff

19   assented to its updated Terms when he allegedly viewed the Blocker Card and clicked "I

20   agree" on March 4, 2021.  See Dkt. 30 at 8-10; Chheena Decl. ¶¶ 9, 14 (Dkt. 30-1 at 3-

21   4).[1]  Plaintiff declares to the contrary that he never saw the Blocker Card, that he never

22   clicked his assent to the updated Terms through the Blocker Card, and that defendants

23   purported evidence is not properly authenticated to show his assent.  Alkutkar Decl., May

24   14, 2022, ¶¶ 3, 4 (Dkt. 32-2 at 2); Alkutkar Decl., July 6, 2022, ¶ ¶ 3, 4 (Dkt. 44-1 at 2).

25

26   _____

27   [1] The parties quibble about whether the button on the Blocker Card read "I accept" or "I
     agree."  Cf. Rozenblatt Decl., Ex. 5 (Dkt. 32-8 at 13) with Chheena Decl. ¶¶ 11-12 (Dkt.
     30-1 at 3-4).  Plaintiff acknowledges that this distinction is not material.  Dkt. 32 at 15.
28   This distinction, corrected by defendants (Wong Decl. ¶ 14 (Dkt. 36-1 at 5-6)), does not
     change the court's analysis.

United States District Court
Northern District of California

1    As in Ruiz and Ngo, plaintiff argues that Bumble fails to describe the security

2    measures taken to ensure that he, rather than somebody else, clicked to accept the

3    Arbitration Agreement.  But no case requires, as this plaintiff argues, that an electronic

4    record of a user's assent to demonstrate a user's assent to an electronic arbitration

5    agreement; rather, authentication can be made "in any manner."  Ruiz, 232 Cal. App. 4th

6    at 843.  The combination of factors advanced by Bumble resemble those found sufficient

7    in Ngo.

8    First, unique credentials were used to access the app.  Plaintiff registered for a

9    Bumble account in February 2016 using his Facebook account information and login

10   credentials.  Wong Decl. ¶ 9 (Dkt. 36-1 at 4).  Plaintiff reports that the Bumble app did not

11   require him to enter his unique login credentials for Facebook after the first time he

12   signed up for a Bumble account.  Alkutkar Decl., July 6, 2022, ¶ 2 (Dkt. 44-1 at 2).

13   Plaintiff also notes that, during the time the app was installed on his phone, "others have

14   had access to [his] phone and have used it."  Alkutkar Decl., May 14, 2022, ¶ 8 (Dkt. 32-2

15   at 3).  But plaintiff's admittedly lackadaisical treatment of his phone, allowing others to

16   access his phone without oversight and leaving apps logged in, does not preclude

17   authentication.  Bumble's records show that plaintiff's unique credentials, the same as

18   those internally assigned when plaintiff first registered for a Bumble account, were used

19   to identify plaintiff when he accessed the app on March 4, 2021.  Wong Decl. ¶ 17 (Dkt.

20   36-1 at 7).

21   Second, plaintiff's access and use of the app is a demonstrable consequence of

22   his assent to the updated Terms.  Bumble's records show that all users were shown the

23   Blocker Card the first time they signed into the app after January 19, 2021.  Wong Decl.

24   ¶ 16 (Dkt. 36-1 at 6-7).  The declarations of Bumble's affiliated engineers make clear that

25   the Blocker Card functions in a straightforward fashion: it "prevents Bumble users from

26   accessing or using the Bumble app unless they click on the orange-colored button

27   located at the bottom of the card to electronically agree to the updated Terms containing

28   the Arbitration Agreement."  Wong Decl. ¶ 12 (Dkt. 36-1 at 4).  Bumble's records indicate

1    that plaintiff was shown the Blocker Card on his mobile Bumble app on March 4, 2021, at

2    22:27:35 GMT, when he opened the Bumble app for the first time after January 18, 2021.

3    Wong Decl. ¶ 17 (Dkt. 36-1 at 7).  And plaintiff's activity on the app on March 4, 2021,

4    including adding photos and swiping on profiles, would not have been possible unless he

5    first clicked to accept the updated Terms.  Wong Decl. ¶ 18 (Dkt. 36-1 at 7).  Plaintiff's

6    documented access and use of the app beginning on March 4, 2021, would not have

7    been possible unless he first accepted the updated Terms by clicking his assent on the

8    Blocker Card.  Plaintiff's use of the app is a demonstrable consequence of his assent to

9    the updated Terms, including the Arbitration Agreement.

10       Lastly, the timeline of events indicates that plaintiff clicked his assent through the

11   Blocker Card.  On January 18, 2021, the Terms governing use of the Bumble app were

12   updated to include an Arbitration Agreement.  Chheena Decl. ¶ 7 (Dkt. 30-1 at 3).  On the

13   same day, the Blocker Card was implemented into the app for existing users, requiring

14   assent to the updated Terms to access the app the first time a user signed in after

15   January 18.  Chheena Decl. ¶ 11 (Dkt. 30-1 at 3-4); Wong Decl. ¶ 12 (Dkt. 36-1 at 4).

16   Plaintiff reports that the first time he signed into the app after January 18, 2021, was in

17   March 2021.  Alkutkar Decl., May 14, 2021, ¶ 5 (Dkt. 32-2 at 2).  This corresponds neatly

18   with Bumble's records, which show that he accessed and used the app on March 4,

19   2021.  Wong Decl. ¶ 18 (Dkt. 36-1 at 7).  On that date, plaintiff added new photos to his

20   profile and swiped on other user profiles, activities that might correspond with a user's

21   first time accessing the app following a hiatus.  Wong Decl. ¶ 18 (Dkt. 36-1 at 7).  Plaintiff

22   additionally accessed and used the app on March 5, 7, and 11, activities only achievable

23   following clicking assent on the Blocker Card.  Id., ¶ 18.  Indeed, plaintiff would not have

24   been able to purchase the premium features that are the subject of this suit in March,

25   August, and September 2021 unless he clicked to accept the updated Terms and

26   Arbitration Agreement.  Id., at ¶ 18.

27       In sum, Bumble has shown that plaintiff used unique credentials to access the app

28   on March 4, 2021, that his access and use of the app on that date was a demonstrable

United States District Court
Northern District of California

1    consequence of his assent to the updated Terms because he only could have done so by

2    clicking through the Blocker Card, and that the timeline of events indicates that plaintiff

3    clicked his assent to the updated Terms.  These facts are similar to those found sufficient

4    to authenticate an electronic signature in Ngo, 2018 WL 6618316, at *6, and they are

5    sufficient to authenticate an electronic signature here.  Bumble thus establishes by a

6    preponderance of evidence that clicking through the Blocker Card was "the act of" plaintiff

7    necessary to show that he electronically signed and agreed to the updated Terms,

8    including the Arbitration Agreement.

9           **2.    Enforceability of Delegation Provision**

10          As described above, after resolving a challenge to the formation of an arbitration

11   agreement, the court must resolve challenges to the formation of the delegation clause.

12   See Caremark, 43 F.4th at 1029-30; Rent-A-Ctr., 561 U.S. at 68-69.  The scope of the

13   court's review is limited in this sense.  Caremark, 43 F.4th at 1029-30 (challenges to the

14   validity of the agreement as a whole must be sent to the arbitrator if there exists an

15   enforceable delegation clause).  The court, having determined above that an agreement

16   to arbitrate was formed based on plaintiff's acceptance of the updated Terms, thus turns

17   its attention to whether the delegation clause within the Arbitration Agreement is valid and

18   enforceable.

19          Courts generally retain authority over the question of arbitrability of a particular

20   dispute, but "parties may delegate threshold arbitrability questions to the arbitrator, so

21   long as the parties' agreement does so by 'clear and unmistakable' evidence."  Henry

22   Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 530 (2019) (quoting First

23   Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).  Here, the Arbitration

24   Agreement expressly contains a delegation provision that delegates all questions of

25   arbitrability to the arbitrator:

26                 The arbitrator has the exclusive authority to (i) determine the
                   scope and enforceability of this Arbitration Agreement, and (ii)
27                 resolve any dispute related to the interpretation, applicability,
                   enforceability or formation of this Arbitration Agreement
28                 including, but not limited to, any claim that all or any part of this

Arbitration Agreement is void or voidable.

Chheena Decl., Ex. B, subsection 4 (Dkt. 30-3 at 11).  Plaintiff does not dispute that this provision within the Arbitration Agreement clearly and unmistakably delegates threshold disputes of arbitrability to the arbitrator.[2]  Rather, he challenges the delegation provision as unconscionable under California law.  Dkt. 44 at 6.  The parties argued at length whether the updated Terms as a whole were unenforceable as unconscionable, and because plaintiff argues that the delegation provision is unconscionable for the same reasons (Dkt. 44 at 6; see also Dkt. 32 at 22-29), the court considers those arguments as they specifically apply to the delegation provision.[3]

Under California law, plaintiffs seeking to invalidate a contractual provision as unconscionable must prove both procedural and substantive unconscionability. Tompkins v. 23andMe, Inc., 840 F.3d 1016, 1023 (9th Cir. 2016) (citing Armendariz v. Found. Health Psychcare Servs., 24 Cal.4th 83, 114 (2000)).  However, "[a] sliding scale is applied so that the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."  Serafin v. Balco Properties Ltd., LLC, 235 Cal. App. 4th 165, 178 (2015).  When evaluating procedural unconscionability, courts focus on oppression or surprise that results from unequal bargaining power; while evaluating substantive unconscionability, courts are more concerned with overly harsh or one-sided results.  Sonic-Calabasas A, Inc. v. Moreno, 57 Cal. 4th 1109, 1133 (2013).  Procedural and substantive unconscionability are discussed in turn as they apply to the delegation clause in Bumble's Arbitration Agreement.

---

[2] In addition to the delegation provision within the Arbitration Agreement, the Arbitration Agreement's reference to the JAMS Arbitration Rules, which delegate arbitrability to the arbitrator, is another basis supporting delegation.  Chheena Decl., Ex. B, subsection 3 (Dkt. 30-3 at 11); Oracle America, Inc. v. Myriad Group A.G., 724 F.3d 1069, 1074 (9th Cir. 2013) (arbitration agreement's incorporation of the AAA's arbitration rules constitutes unmistakable evidence of delegation of arbitrability).

[3] Plaintiff raised the challenge to the delegation provision for the first time in his sur-reply, but because the challenge is premised on the same unconscionability arguments raised elsewhere against the Arbitration Agreement as a whole (see, e.g., Dkt. 32 at 22-29), defendants had ample opportunity to rebut the arguments (Dkt. 36 at 15-19).

United States District Court
Northern District of California

### a.     Procedural Unconscionability

"Procedural unconscionability concerns the manner in which the contract was negotiated and the respective circumstances of the parties at that time, focusing on the level of oppression and surprise involved in the agreement." Chavarria v. Ralphs Grocery Co., 733 F.3d 916, 922 (9th Cir. 2013); see also Sanchez v. Valencia Holding Col, LLC, 61 Cal. 4th 899, 912 (2015).  The analysis for procedural unconscionability "begins with an inquiry into whether the contract is one of adhesion." OTO, L.L.C. v. Kho, 8 Cal. 5th 111, 126 (2019) (quoting Armendariz, 24 Cal. 4th at 113; internal quotation marks omitted).  Generally, a contract of adhesion is a "standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." Pinela v. Neiman Marcus Grp., Inc., 238 Cal. App. 4th 227, 242 (2015) (quotation omitted).  Where a contract is adhesive, the question shifts to "whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required." OTO, 8 Cal. 5th at 126.  However, the Ninth Circuit has found that a delegation provision is not adhesive and thus not unconscionable if there is an opportunity to opt out of the arbitration agreement. Mohamed v. Uber Techs., Inc., 848 F.3d 1201, 1211 (9th Cir. 2016) (citation omitted).

Plaintiff argues that the delegation provision was presented as a contract of adhesion where Bumble drafted and presented it to all users on a take-it-or-leave-it basis, depriving them of both the ability to negotiate and meaningful choice.  Defendants counter that the Arbitration Agreement includes an opt-out provision, describing that plaintiff merely had to send an email to a designated opt out email address "within 31 days after first becoming subject to this Arbitration Agreement." Chheena Decl., Ex. B, subsection 7 (Dkt. 30-3 at 11).  Plaintiff avers that this opt-out provision was misleading because the Blocker Card represented that a user could opt out "by 30 days from January 19, 2021," (Chheena Decl. ¶ 11 (Dkt. 30-1 at 3-4)) or February 18, 2021, a date that had already passed before his March 2021 review of the Blocker Card.

1    Defendants have the better argument.  Bumble's opt-out terms are easily complied

2  with, where users must simply send an email identifying themselves along with a

3  straightforward statement of opt-out.  Chheena Decl., Ex. B, subsection 7 (Dkt. 30-3 at

4  11).  Any confusion on the part of plaintiff based on the erroneous date on the Blocker

5  Card would have been easily overcome by review of the updated Terms—the Terms are

6  the contract, the Blocker Card merely provides inquiry notice.  The existence of a

7  meaningful opportunity to opt out of arbitration necessarily renders the Arbitration

8  Agreement and its delegation clause procedurally conscionable as a matter of law.

9  Mohamed, 848 F.3d at 1210.  The Arbitration Agreement does not constitute a contract of

10  adhesion and there is no procedural unconscionability, leaving further assessment of

11  oppression and surprise in the formation of the contract unnecessary.  Because both

12  procedural and substantive unconscionability are necessary to invalidate the delegation

13  provision, the assessment could end there.

14              **b.    Substantive Unconscionability**

15    Even assuming arguendo that plaintiff demonstrated some procedural

16  unconscionability, he must also demonstrate substantive unconscionability.  Under

17  California law, substantive unconscionability focuses on the terms of the agreement and

18  whether those are so "overly harsh" or "one-sided" as to "shock the conscience."  Circuit

19  City Stores, Inc. v. Najd, 294 F.3d 1104, 1108 (9th Cir. 2002); Pinnacle Museum Tower

20  Ass'n v. Pinnacle Mkt. Dev. (US), LLC, 55 Cal. 4th 223, 246 (2012).  "The standard for

21  substantive unconscionability – the requisite degree of unfairness beyond merely a bad

22  bargain – must be as rigorous and demanding for arbitration clauses as for any contract

23  clause."  Sanchez v. Valencia Holding Co., LLC, 61 Cal. 4th 899, 912 (2015).

24    Defendants argue that the Arbitration Agreement and its delegation provision are

25  exceedingly fair where (1) Bumble will reimburse all fees and expenses of arbitration for

26  plaintiff's claims totaling less than $10,000 (unless arbitrator determines claims are

27  frivolous); (2) plaintiff may choose to have arbitration conducted by telephone, based on

28  written submissions, or in person in the country where he resides; and (3) plaintiff has the

United States District Court
Northern District of California

1   ability to obtain any monetary or non-monetary relief on an individual basis that would be

2   available in court.  Chheena Decl., Ex. B, section 13 (Dkt. 30-3 at 10-11).  Defendants

3   are correct that unconscionability challenges have failed on terms even less favorable to

4   consumers.  See, e.g., Ulbrich v. Overstock.com, Inc., 887 F. Supp. 2d 924, 933-34 (N.D.

5   Cal. 2012) (rejecting unconscionability challenge even where arbitration provision

6   required individuals to share costs of arbitration, required arbitration out-of-state, and

7   lacked mutuality in the remedies available to the parties).  In contrast to the lack of

8   bilaterality found in Armendariz, 24 Cal. 4th at 118, this Arbitration Agreement is bilateral,

9   requiring "any dispute" relating to "use of [the] App" or "relationship" with Bumble to be

10   arbitrated.  Chheena Decl. Ex. B, subsection 1(Dkt. 30-3 at 10).  The Arbitration

11   Agreement does not impose unfair terms and it does not shock the conscience.  The

12   delegation provision is not substantively unconscionable.

13          Plaintiff argues alternatively that the Arbitration Agreement is substantively

14   unconscionable because it would unfairly and unnecessarily preclude any of the 100

15   million Bumble users, should they own stock, from bringing a shareholder derivative suit

16   against Bumble Inc.  Dkt. 32 at 26.  The court finds plaintiff's proposed interpretation of

17   the Arbitration Agreement simply unreasonable given its context—it is included within

18   Terms for Bumble users.  See Dkt. 30-3 at 1.  But more importantly, such an

19   interpretation is irrelevant to the instant dispute, focused on users' experiences with the

20   app's premium features.  The court does not find that the Arbitration Agreement is

21   substantively unconscionable based on plaintiff's strained interpretation of the user

22   Terms.

23          In sum, the Arbitration Agreement and its delegation provision are not

24   substantively unconscionable.  Therefore, the delegation provision is enforceable.

**CONCLUSION**

26          For the foregoing reasons, including defendant's showing by a preponderance of

27   evidence that plaintiff assented to the Arbitration Agreement and the enforceability of the

28   delegation provision, the court GRANTS defendants' motion to compel arbitration.  The

lawsuit is STAYED pending completion of the arbitration proceedings.  The court GRANTS defendants' unopposed motion to file documents under seal.  The court does not reach the merits of defendants' motion to dismiss the complaint, and it is accordingly TERMINATED.

**IT IS SO ORDERED.**

Dated: September 8, 2022

/s/ Phyllis J. Hamilton

PHYLLIS J. HAMILTON
United States District Judge